Co-Counsel and I are going to split time 15 minutes for me, 5 minutes for him, and I'd like to reserve 5 minutes for rebuttal. There are three points that I'd like to address in my oral presentation today. First, the whole question of whether there was sufficient evidence to convict my client for a violation of Section 666. Secondly, whether the agent identified by the government in the indictment and in its attempt to prove its case was whether Gary Koval was really an agent of any of the entities involved in the transactions. And then third, whether the case ought to be remanded to a different judge if the case is remanded. So with respect to the first point, which is our main point, that there was no evidence of a violation of 666, we have to remember that 666 requires certain things. In the Ninth Circuit, this Court has said multiple times that there has to be federal money going to a government or a governmental agency that agency has to engage in transactions. Those transactions have to give rise to or be connected to the fraud or the bribery or the kickback. In this case, none of those things were met. There was evidence that a tribal agency received federal money, a federal grant from the EPA. What can you tell us about the relationship between the tribe and the tribal EPA? I didn't see very much in the record on this question. I think we all agree it's an agency of the tribal government. There is a tribal government. Is there a separate, is there an incorporation requirement? Is there separate registration as a government requirement? Does it have separate legal counsel? Does it have a separate office? Well, I don't think it's a separate corporation. I think it's simply an agency of the tribal government. How big is this tribe? At the time that I was involved with that, there were about 14 members, 14 adult members. So we have 14 adult members of the tribe. Right. Okay. Now, do they all have responsibilities in governing the tribe? Are they all members of the tribal council? There are two things, and there was some confusion. There's something called a tribal council, which is, my understanding, is like a town council meeting. People from the tribe or adults from the tribe come and speak and talk about things. Then there's the general council. And we've, in the record, we have included the general council's resolutions. By general council, you're spelling council, C-O-U-N-C-I-L? Correct. Or S-E-L? C-I-L. Okay. So there's a general council, and what is that? That's the governing body of the tribe. And that is some subset of the members of the tribe? Correct. Okay. And does it have people who are not on the tribe? Not as far as I know. Okay. So it's a subset. All right. Now, is there a tribal member who heads the tribal EPA? Is somebody in charge of the EPA committee? I don't think there's any evidence in the record about who ran the tribal EPA. I think they had non-Indian employees who ran the tribal EPA. Is it physically located in the same building as other parts of the tribal council or general council? I believe the tribal EPA had its own building on the reservation. Counsel, could I get you to ask a maybe answer a foundational question that might precede these? I think your premise is that the $10,000 grant or that requirement, I think it's $1.7 million, but it went to the tribal EPA, right? And that's the premise for this notion that that has to be the entity we're talking about for the 666 conviction? Well, there's no dispute. The money, the federal money, went into the tribal EPA. It went into its bank account. Wait a minute, wait a minute. That's the point. Maybe you could help me with this record. I think that what the record tells me when I look at the documents that were submitted with a statement of stipulated facts is that the recipient organization identified by the United States was the EPA, the tribal EPA. Correct. And I think that your brief tells me that. But the grant proceeds are listed in the tribe's financial statements under special revenue fund at ER 850 to 851. What do we do about that? I think that's perfectly consistent with what I'm saying, and that is that the tribe has an agency. It separates out its funds differently. And then over here, completely separate, the tribe also owns a corporation. Well, this sort of gets back to Judge Bybee's question, the extent to which the tribal EPA is a separate entity. Is it separately incorporated? And what does the law really require for this conviction? Every transaction alleged in the indictment, every transaction that was paid for, had nothing to do with the tribe. It had all to do with Enterprises Corporation. For the 666 conviction, there has to be an organization. It might be a tribal government, but it could also just be an organization, right, as long as it's the same one that receives the jurisdictional hook, speaking, right? As long as it's the same one that receives the government fund and then engages in this scheme or is the victim of the scheme. Isn't that right? Right. Why can't that be the tribe? If you say it's the tribe, and I don't think you do, because if I can harken back to a Second Circuit case from a while ago, the Santi Pietro case, the Second Circuit said you don't trigger 666 because, you know, the Parks Department of the State of New York got a $10,000 federal grant because a meat inspector did something wrong. You have to look at the agency that gets the money. Can I stop you there? So my two-part question, then I'm going to get out of your way and let you answer it. My two-part question is, how is it that I reconcile the auditor's reflection, that the money actually shows up on the tribe's financial statement here? And then the second question is, what's the best Ninth Circuit authority for the notion that the EPA, as a division or department of the tribe, isn't a close enough connection? Well, if I could answer it this way, even if the tribal EPA is part of the tribe, and it's an agency of the tribe, that doesn't make this case a criminal violation of 666 because all of the transactions were of a different corporation. So, yes, I think you have to look at the tribal, where did the money go? Did that agency engage in transactions? Were those transactions connected somehow to some kind of wrongful conduct? But even if you say, okay, the tribal EPA is part of the tribe, it doesn't matter, because Enterprises Corporation is the one that paid for, adopted all the resolutions, you know, approving all of the construction contracts at a casino. And the relationship between the tribe and Enterprises Corporation is what? It's wholly owned? Correct. It is separately incorporated as sort of a private, under the laws of California kind of thing? It's incorporated under federal law. Federal law allows Indian tribes to create corporations to essentially compete in the competitive commercial world so that the corporation can actually waive its sovereign immunity and be able to go out and borrow money and those kind of things. And that's what happened here. The Enterprises Corporation, which owns a casino and runs the casino and its charter specifically, says our transactions are not the transactions of the tribe. They are our own transactions. The Enterprises Corporation went out and got a $120 million loan in order to, you know, refurbish or renovate the casino and pay contractors, including Cadmus Construction, which was the construction company here. So to answer your question, you still have to say that the agency that gets the money. What was the relationship between Mr. Koval and the Enterprises Corporation? Was he their counsel? Did he act as counsel at any time for Enterprises? Yes. There are legal bills in the record that show that Enterprises. Was he billing separately to Enterprises and the tribe? Yes. He billed separately to Enterprises, he billed to the tribe, and he billed to the gambling commission, which was a separate agency. Did he ever advise the tribal EPA? There are no bills paid for by the tribal EPA. So was he being paid by a separate account from Enterprises Corporation and the tribal counsel? Yes. There were separate bank accounts for each one of these entities. And the tribe took great pains to keep things separate. And I'm not blaming them for doing it. Well, there may have been some casual language. Great pains? It looks pretty fuzzy to me. Well, but when push came to shove, you know, when you even have a tiny corporation with two people, you still have to have those resolutions, right, in order to protect yourself from potential personal liability. So they have Enterprises Corporation's resolutions and general counsel resolutions, and they have separate bank accounts, they have separate financial statements. So there are times when, you know, different tribe members have to put on different hats. Of course, that would be in any small government. What about the tribal members putting on different hats? I'm worried about that, and maybe word is the wrong verb, but I haven't really heard you respond to my two questions. That federal grant money that we're talking about for the jurisdictional hook shows up on the tribe's audit in one of its accounts. And I think maybe you've answered that the best that you can, if it's a division or department, but you haven't answered the question about what's the strongest Ninth Circuit authority for your argument that that's not close enough. Well, I think there are several. Wing Coop, then Wing Coop was reaffirmed in Cabrera. It was reaffirmed in Shelton, which is an unpublished opinion, with the panel specifically said it has to be the agency that got the money, and the jury instruction was incorrect. I think the conviction was not overturned because the argument wasn't preserved. And the other case besides Cabrera was Bynum, and those were 2003 and 2004 cases. Thank you. So that Wing Coop concept, it's got to be this direct connection between the money going into the agency, and the agency has to be connected to the transactions, and the transactions have to be the ones that give rise to the wrongful conduct. So I have a sort of theoretical question for you, and then I know you want to save some rebuttal time. It's a legal question for us whether the stipulated facts are sufficient, but don't we have to view the facts if they are ambiguous in favor of the government? Because there's no breach of the plea agreement. If a plea agreement has been breached, we look at things in favor of the defendant. But here, wouldn't we have to view any ambiguous facts in favor of the government? Well, I don't know of any ambiguous facts here. I think that the parties, the reason we entered into the stipulation was the parties understood basically what the facts were, that enterprises paid for it. Right, but, for example, Judge Christin has pointed to evidence that suggests that the tribe was the recipient of the money, for example. So if there is any ambiguity in the stipulated facts, do we have to view it in the government's favor? I don't know a case on that, Your Honor, and I'm not going to, I would say... Well, that's the usual rule when someone has been convicted, correct? It's the usual rule after a jury trial that you would do that, yes. But here, where we sort of hammered out some facts, and we both had input into it, I don't know that you would construe facts, why you would construe facts against one side or the other. If there was an ambiguity, and I don't think there is, because, like I said, even if these, even if you collapse the two, the tribe and the EPA, it doesn't matter, because none of the transactions were of the tribe. None of the tribe, you see what I'm... I understand your position. I don't really, I can't really, you know, affirmatively say you absolutely should not construe it against my client, but even if you construed it against my client, it wouldn't matter, because they couldn't prove the case. Counsel, could your client have been prosecuted by the State of California? Unlikely, in my judgment, having looked at the... Because they would lack jurisdiction? Oh, no. Oh, on a jurisdictional question, I doubt that. You're telling me that you don't think they would have because the federal government was prosecuting them? Well, I think that's... No, I looked at the California commercial bribery statute because it was originally cited in the money laundering counts that were dismissed, and it arguably covered the conduct. I don't know. But there's no jurisdictional impediment over the fact that it involved an Indian tribe? No, because he is an American living not on a tribal reservation. I'm not an Indian law expert, but I don't think there would have been any impediment to the state actually looking into the question of these rewards. Thank you. We'll hear from your colleague, I guess, if you want to save rebuttal time. Okay. I did want to talk about those other two issues, but I'll keep my time. You can use up the rest of your time if you prefer. No, no. Good morning, Your Honors. My name is Ed Robinson, and I represent Mr. Koval. I say this with the greatest respect for the district court because I believe he tried to do what he believed at the time was the right thing. I would suggest that the errors that I'm pointing out to the court, in my opinion, were the product of his emotion as opposed to proper legal reasoning. What's not an issue is this. Mr. Koval agreed in his plea agreement, and the government agreed in their filings with the court at restitution, that Mr. Koval would be responsible for the $603,000 in restitution. And we're not contesting that he owes that money. The only things that we are contesting here is the application of the Mandatory Restitution Act because it will affect him for the rest of his life, as well as the court's calculation and the method that it used in calculating the fees and costs that went to the tribe's lawyers as part of the court's restitution order. Because we're not contesting the fact that the court properly ordered $603,000 of restitution, what I'm saying is that this court owes deference to that finding by the court, that it's supported by the facts that were presented at the restitution hearing. The facts that were supported at the restitution to which this court defers, and as argued and presented by the government, refer directly to the object of the conspiracy, which was the 666 bribery count. The fact that the court made the finding that the $603,000 was the only money to be paid in restitution by implication states that the court made a finding that any other conduct that particularly the tribe's lawyers argued, could not have been proven to a preponderance to support a greater restitution finding with respect to the damages caused to the tribe, and could not be the basis for a finding that this crime was committed by some kind of fraud and deceit. And so the overlap between the mandatory act and the finding that the tribe's lawyers were entitled to legal costs and fees for their involvement in this prosecution goes like this as I see it. The mandatory act does not apply, according to Adorno and from an elements test, to 666 bribery. It doesn't involve property as an element, and there's no fraud or deceit in the elements of 666 bribery. The government had wanted to prosecute this case as a fraud case or a theft case of property. They could have used the subsection 666A1A. They chose not to do that. In the record, there was discussion about how this case had been under investigation for four years or so, and we were constantly in a position trying to settle the case pre-indictment, and the prosecutor who was in charge of that investigation, later replaced by Mr. Fox, made it clear that this was not a fraud case. This is a bribery case. So when the district court judge awarded fees and costs to the tribe's lawyers, I submit he did that based upon emotion, and the reason he did it based upon emotion is tied somewhat to Mr. Shapiro's argument that maybe he was somewhat offended by this situation. I'm not asking for a different judge on remand if there is one, but if you look at the manner in which the district court said, you know, I've sent you back twice now, lawyers for the tribe, to give me something I can use to determine whether or not you actually, at the prosecution's request, aided and assisted them in the prosecution of the bribery case, he threw up his hands, and he used the formula that is not related to. I'd like to take you back. So you're arguing that the MVRA does not cover crimes under the section, your client was prosecuted under section 666 because the crime does not involve fraud or deceit. Is that correct? Fraud, deceit, or property. That's correct. Okay. Now, why doesn't it involve property? Well, the district court and the government cited the Gaten case, and the Gaten case is a bribery case. It doesn't reference whether or not the mandatory act applies. It just discusses whether or not ill-gotten gains are to be part of a restitution order. It's like the guideline analysis for loss under 2B1.1. There can be loss assigned for actual or intended loss or ill-gotten gains. What happened in this case, and what are the facts that Judge Fitzgerald used, to which we are deferential to? When the section says an offense against property, how are you interpreting that word property? It has to be against real property? It has to be like damage to property or something? It has to be. Yes, I am. Do you have any authority for that? Only in the inference that we draw from Gaten, and that is that these are ill-gotten gains. When you look at Adorno, the only case that has addressed whether or not the mandatory act applies to 666 bribery, the facts in the case are clear that there was a bribe paid, but the court made a finding that it wasn't property, implicit in the fact that the court ordered no restitution. I would suggest that the Adorno case and Gaten, and just the idea that particularly with the facts in this case that there was a sharing of profits, not a taking of property. The interpretation of the phrase, including any offense committed by fraud or deceit, is that fraud or deceit must be an element of the crime? I think it should, but if the court is inclined to look at, and there's an Ayyad case, if I'm mispronouncing that, I apologize, talks about where there's a conspiracy that the court can look at uncharged conduct, and I don't want to mislead the court in any way. There can be restitution paid outside of the elements, but in this case, looking at the manner in which the district court found that only the $603,000 had been proven to a preponderance for the purpose of ordering restitution, if this court were to determine that there was restitution owed for uncharged conduct, then it would have to make a finding that the district court was clearly erroneous in its application of the law to the facts, and that's not what we have here, and the government's not arguing that. That's not an issue before this panel. Thank you, counsel. Thank you. We'll hear next from the government. Good morning, Your Honors. May it please the court. Lindsey Greer Dodson on behalf of the government. With the court's permission, I'd first like to address Defendant Heslop's challenge to his conspiracy conviction and then address the restitution issues. So with regard to the conspiracy conviction, the case before this court is actually quite narrow and simple for two reasons. First, Defendant Heslop signed a conditional plea agreement in which he waived nearly every issue he now raises on appeal, including that agency issue that he plans to address in rebuttal. And second, with regard to the two issues he actually did preserve and now argues, the factual basis, the 19-page factual basis clearly resolves both of those issues, and the two substantive issues on appeal are, one, whether the business transactions  with an Indian tribal government as Section 666 requires, based on the stipulated facts. And second, in the alternative, even if somehow these weren't transactions with an Indian tribal government, whether nevertheless there's still an adequate factual basis for the conviction in this case. The answer to both of those questions is yes. And I'd like to – It has to be an Indian tribal government. It can't just be an organization as long as it's the same one. I believe it does have to be an Indian tribal government under Section 666. The organization is under 1163, which is an Indian tribal organization. I can look at the statutory language as well. Well, it says both. Then the court is right. Absolutely. Well, I'm not trying to put words in your mouth, but it's critical, I think. And I think there was this assumption in the briefing that it had to be an Indian tribal government, but I don't think that's what the law really requires. Understood. So what does organization mean there? I think organization means I don't have to be a corporation. Well, in this case, a Section 17 corporation would apply because a Section 17 corporation is a wholly owned corporation that's an arm of the tribe. I want to get to that one, but I'm still trying to figure out what A-1 means. Being an agent of an organization? It doesn't have to be a governmental organization. It could be anything. We have to look to the second part to say, well, as long as you get $10,000. Correct. And I think it's exactly. It could be a private organization as long as you receive some kind of federal monies. As long as, in this case, there's a nexus to the Indian tribal government, I would argue yes. I mean, if you have some kind of a grant to the March of Dimes and somebody was stealing money from the March of Dimes, then presumably this section might apply. Is that right? Yes. Even though the March of Dimes is not a governmental organization. Correct. Okay. So is it your position that the money went to the tribal EPA, or is it your position that it went to the tribe? Well, both. Okay. So here's the answer, and this is what's stated in the factual basis. So it says that the money was deposited into the tribal EPA account, but it says at HESLOP's Excerpt of Record 291, the tribe owned the account into which the proceeds were deposited. Quote, the grant proceeds were distributed to the tribe. That's also at 291. And the U.S. EPA listed the tribe, specifically the tribe, as the recipient organization and the payee in this case. There's no question that. And the audit shows this in a tribal account. Agreed. Yeah, absolutely. Okay. Absolutely. So the money is going to the tribe. Now, Defendant HESLOP has argued both in his briefs, and he asserted it again before this panel, that the business and transactions were only with enterprises. One, even if that were true, the government still wins, but that's just factually inaccurate from the stipulated factual basis. With the Court's permission, I'd just like to cite a few. We go through them extensively in our brief. But there are numbers of sites where it's both the tribe and enterprises, or even in some instances just the tribe that's involved in the transactions. I mean, the best piece of evidence is at HESLOP's Excerpt of Record 296, where on February 1, 2007, the tribe, not tribe and the enterprises, but the tribe entered into that construction agreement with Paul Bardos and Bardos Construction for the three main projects that are at issue in this case, projects on tribal land. And in addition, throughout the factual basis, it talks about the tribe and enterprises entering into the Diversification Resources Consulting Agreement, the tribe and enterprises as the, quote, owner in that agreement, and throughout their business dealings, how both defendants constantly talk about the tribe. It's not enterprises, but the tribe. Again, the 19-page factual basis again and again and again talks about the involvement of the tribe. The tribe and the tribal council members at tribal council meetings are the ones approving and passing resolutions to award these construction contracts. This is not something, and that's at HESLOP's Excerpt of Record 299. But their argument is going to be that they were wearing different hats. It's a small number of people, but his argument is that they're wearing different hats, and they, I think, abided by corporate formalities and their distinct entities. None of that's a – Would you like to respond? I disagree with that, and I think counsel for the tribe can better address the relationship. But that's not in the factual basis. What the factual basis says is, yes, there's the tribe, and yes, there's a Section 17 corporation, which under Section 17, that Section 17 corporation is an arm of the tribe. It's an incorporated tribe. And it specifically says time and time again in the factual basis that everything that's happening is with either enterprises and the tribe or just the tribe. That alone resolves the issue in this case. But even if we were to get to the second issue, even if we assumed what Defendant HESLOP's arguing, which is that all of the transaction only involved enterprises, enterprises is not some corporation formed under state law of which the tribe has some remote tangential interest. This is, again, a Section 17 corporation, and a Section 17 corporation under 25 U.S.C. Section 5124, that's formally Section 477, says that a Section 17 corporation is, quote, an incorporated tribe. And that's why there's no tax immunity. There's tax immunity for a Section 17 corporation. There's sovereign immunity. This is an arm of the tribe. This is how the tribe does business. So in that sense he – I'm sorry, enterprises has, the casino has sovereign immunity? Yes. Well, I can point the court to a case that talks about Section 17 corporations being an arm of the tribe and having sovereign immunity, if the court would like. It's not in our briefs, but I'm happy to provide it. I just find it really curious. So the tribe can't be sued for a slip and fall in the casino? I don't know in that specific case, but I know that generally there is Sixth Circuit case law that says because a Section 17 corporation is an arm of the tribe and is so closely tied to the sovereign entity, that it still maintains sovereign immunity unless explicitly waived. So in that sense, enterprises is, of course, as an arm of the tribe, the way the tribe does business. Even if the business transactions were solely with enterprises, that would bring enterprises within the ambit of Section 666. So in that sense, that resolves the first issue. Can I just ask you, what's the strongest case law support for your view that this is a close enough connection? Well, there is not Ninth Circuit or any authority that I'm aware of that says that a Section 17 corporation constitutes an Indian tribal government for purposes of Section 666. There is analogous case law from the Eighth Circuit, and one of the cases is the White Horse case, which Pemberton, which we also cite, discusses. And basically, the question was whether a telephone authority company was an Indian tribal organization, which would be analogous in this case. But your primary point is that we don't have to even get there because it's the tribe in the stipulated facts that is agreed upon to be the entity involved. Absolutely. This is an argument in the alternative under which we still prevail. And one of the reasons is just to answer Your Honor's question, is the White Horse case in the alternative. That's our best authority. I'd like to ask you if it's okay to move to this about restitution because I have some concerns about that. Sure. And they're really two separate concerns. And I'll ask them both, and if you can't keep track of them both, we'll break it up. The first one is how do we decide what is or is not an offense against property under this title? And the second is more specifically, if the MVRA does apply, why was the evidence sufficient? Doesn't it have to be much more precise a calculation than was made in this case? With regard to your second question, are you referring to the calculation of the award of restitution and the attorney's fees and costs? The attorney fees and costs. Okay. I'm happy to address both. With regard to the court's first question regarding an offense against property, that issue, I don't know that we fully briefed it because I didn't understand Defendant Koval's argument at any point in his briefs to be that there wasn't a property offense. It was largely about whether or not this offense against property involves fraud or deceit. Nevertheless, I think money is, of course, property, and certainly everything that involved involved a construction project for projects and buildings on tribal land. So I think either way, we've got the offense against property. Now, regarding the offense against property involving fraud or deceit, there's nothing that says it's fraud or deceit. There's nothing that says that fraud needs to be an element of a Section 666 or there has to be a fraud or deceit. Well, it doesn't have to be fraud or deceit at all because it's including that, but it's not the generic. Correct. That's why I asked about property offense. Correct. And one thing in the Gaytan case that we cite is certainly the court does not mention 666, but it's a bribery case in which a local official is taking bribes for approving resolutions to do business. The offense in that case is money, or the property in that case is money from the bribes, and the court is saying in the mandatory, not permissive language, but in mandatory, that the ill-gotten gains must be accounted for, and the ill-gotten gains are the bribe money that the local official received. And I would like to address briefly before I get to the court's second point, the Adorno case that Mr. Koval's counsel cites. That's an Eastern District of New York case. It didn't stand for the proposition that in every bribery case, there could never be an offense against property involving fraud or deceit. What it said was on the facts before the court based on that record, it couldn't find that the manner in which the crime had been committed involved fraud or deceit. It was an honest services fraud case. The court just said it didn't have enough. This is incredibly different. At nearly every page in this factual basis, it talks about ways in which the defendants are deceiving the tribe, creating a separate corporation or having a separate entity, that's the Bardos Construction Company, get awarded the contract so that the tribe doesn't know that Mr. Heslop is getting those bribes, getting those kickbacks, things like that. The manner in which these crimes were committed involved fraud or deceit. With that, I'd like to address the court's second question regarding the fees and costs. I do understand the court's concern. However, under the Arad case, I think we've got enough in the record, precisely because the tribe in this case submitted it, and the tribe can speak more to that, but over 200 filings in this case regarding the fees and costs and specific attorneys, bills and everything. But with both the statute, I'm sorry to interrupt, but it seems both the statute and the case law require the exact amount of laws to be determined, not estimated, and that's my biggest concern. So I think what the court says, particularly in the Arad case, is that the court's not obligated to give an exhaustive accounting, and where a court reduces an award of attorneys' fees and costs, it doesn't mean that the actual loss that was hired, it doesn't mean it's still not an actual loss. In this case, the court thought, based on its experience running a law firm and whatnot, that a lower award of attorneys' fees and costs would be more appropriate, but that doesn't mean that he... Tied it to class actions. Why is that multiplier relevant here at all? Well, let me be clear. It wasn't a multiplier. It was a reduction formula. Right. But it was a percentage. It's a yardstick, and it strikes us as, I shouldn't speak for myself, a peculiar one. I understand. I understand. However, what I would say is what the court did say on the record was that he had reviewed all the pleadings, all the filings. He had considered them along with the oral argument at both restitution hearings, and he said, based on all that, I understand we have this loss amount, but he didn't think that that amount was appropriate, and he wanted to reduce it. And again, I can let the tribe discuss that a little bit more. That was an issue they were planning more so to address. But I don't think that it means, based on this record, that he didn't believe or the court didn't find that there was an actual loss amount. It was a reduction method precisely because he just thought it was too much based on his experience. Right or wrong, the record before the court, I don't think that the reduction means that it's not an actual loss. If anything, the billing records submitted by the tribe show that they have attorney's fees and costs of approximately $1 million, which is what they're arguing. Does it give you that as long as the tribe, or I should say the court, had evidence that the tribe had actually incurred a greater amount, that even though the judge mentioned these perhaps alternate ways of reducing, eyeballing the total bill, and as long as it was a reduction that it's acceptable? Yes, and that's specifically the arid case that we cite in our briefs. With that, I understand I have a minute left. Is there any other question on restitution, or would the court like me to address either agency or the remand issue? I think we don't have any further questions. Okay, thank you very much. I appreciate the time. And may I cede my last minute to the tribe since we are dividing? Yes. Thank you. Thank you. Good morning, Your Honors. Richard Freeman before the tribe and the victim. There are a lot of things covered, and I will speak as quickly as I can and hopefully won't get off track. I've got a few things that I would really like to, a few points I'd really like to make on the restitution issue, but there were some factual questions from Your Honors that counsel deferred to me on, and I would just like to mention quickly. The EPA operates in a government office as well as a trailer in an office of the tribe. It's probably as big as this courtroom. That's how close the EPA is to the tribal council conference room. The EPA, by definition, just by inference, we're talking about construction on a tribal building owned 100% by the tribe in this case and a parking lot owned 100% by the tribe in this case with title in the federal government. Title is held in the federal government. So the EPA, by definition, has to be overseeing the construction in this case, and that's something that I don't think should get lost in the shuffle here. By definition, the environment is being disturbed and the EPA is overlooking the disturbance of the environment when this construction is going on. So I wanted to make those points. I also wanted to mention the Sixth Circuit case that counsel mentioned. I'll just give you the citation on that. That's the Memphis Biofuels case, 585 F3rd 917, Sixth Circuit 2009. Has that been cited in any of the briefs? No, it hasn't. Would you submit a letter to the court so we know how to do it? I will, Your Honor. Thank you, since that issue has come up. And that case, although it's not a Ninth Circuit case in its reasoning, cites a Ninth Circuit case, the name of which I've forgotten, as part of its reasoning. And so I think it's particularly relevant. Now I'd like to just turn to the issue of restitution, which is the focus of our issue, and I just want to get some very basic points on. These briefs were so long, and there's some accounting issues here that I think I want to try and get some clarity. If you'll just give me 30 seconds, I'd like to give you the building blocks that I think we're working with, assuming the MVRA applies and that that's been briefed ad nauseum. First word is the court shall require the payment of, out of the MVRA.  You will pay for investigation, participation, and prosecution. This is a 58-count indictment that most of the attorney's fees, private investigator fees, and accountant fees were incurred under. Judge Fitzgerald, I agree with Mr. Robinson. I think he was definitely trying to do the right thing. I don't agree with the emotion part of it because he said, and this was a wrong standard that he had to give every deference to the defendants in analyzing what costs to award here, not the victim. But he did not have the benefit of the IROD case that we've cited and discussed. And we could have written 90% of our brief based upon the Ninth Circuit IROD case that is discussed in our brief. It goes through a lot of different issues. But one of the most important points that I'm not sure that we emphasized enough out of the IROD Ninth Circuit decision, which was last year, is when you engage in a series of corrupt transactions, and by the way, the plea agreements use corrupt, you must expect that the accountant fees, the lawyer fees, the investigation fees are going to be high. The defendant needs to expect that because they are difficult to discover. In this case, we're talking hundreds of thousands of documents, computers. This was quite elaborate. Now I'd like to address what one of your honors raised about this 25% class action standard. It was applied to the investigator fees, the accountant fees, and the lawyer fees. Well, what if the restitution was $100,000? Does that mean you award $25,000 even if you put a million dollars into assisting the government? What if it had been $100 million? Would you give the tribe $250 million in attorney's fees? There's no correlation here when the MVRA says you reimburse the victim of the expenses incurred, quote, unquote. That's what the Ninth Circuit has said in numerous cases. And the judge here, and I agree with your honor, really didn't articulate how he could collate the expenses incurred by the victim to a 25% success factor. There's no success here. The tribe was assisting the FBI and the U.S. Attorney in obtaining a conviction. It wasn't about getting money. Counsel, if we were to join one side of the circuit split on whether you can take a direct appeal of the MVRA, do we still have the power to remand this to the district court and find error if you don't have standing to appeal? Probably not. Could we view this as a mandamus in the alternative? Well, let me address both questions, which I think the answer is a little bit different. One of the things that's in a footnote to our brief that I want to emphasize is that if you look at the congressional record about the intent of the MVRA, our own Dianne Feinstein is what we cite to, and she says the intent of the MVRA is to give victims appellate court rights. Well, appellate court rights could be what the MVRA provides for, which would be the right to seek a writ of mandamus, which is what the Act specifically gives you. Well, she says standing on appeal. That's what Dianne Feinstein says. The mandamus remedy, I don't think, is an adequate remedy because if you look at mandamus, it says no adequate remedy at law. You've got to prove that. And if you have an appellate court right at law to appeal, then you've got an adequate remedy. You don't need mandamus. If you don't. But if you don't, then you do need to bring the mandamus. That's what the D.C. Circuit said. Okay. Well, I just believe that that is incorrect. You filed both a writ of mandamus and you filed the appeal. We dismiss the appeal and grant the writ. Okay. Well, we had no motion down below, which is what mandamus requires. The party has to have made the motion and has no adequate remedy at law. So I do not believe that using the mandamus approach would be adequate for a victim here. I don't think Feinstein intended that, and I don't think that would give the burden would be much higher on the victim, which is not the intent of the MVRA. So that's my response to that argument. Now I've lost the second question that I think you raised. The one final thing that I'd like to say, because I see the red light, is that the plea agreements in both of these cases, in terms of also the building blocks that we're using, is they say the defendants shall be required to give restitution to the victim here on the count that they're pleading guilty for, the counts that were dismissed, which were 58 counts, and any relevant conduct. That is the scope. Judge Fitzgerald, God bless him, didn't understand that. He thought he had a very narrow perspective that he could take here in awarding restitution. I'm certainly not suggesting that Judge Fitzgerald should be taken off this case, but I think your honors can send this case back with clearer directions. Finally, the prejudgment interest. He never addressed that. It was laid out in great calculations, and whether the prejudgment interest is at $603,000 or even at $683,000, which is there was an arithmetic mistake by both counsel for the defense and the U.S. Attorney's Office. The plea agreement says they're going to pay essentially for all the bribes. Thank you, counsel. Okay, thank you. There are a few things that I'd like to address that the government argued and that Mr. Friedman argued. First, I looked back at the record references with respect to the financial statements of the various entities, and at excerpts of record, at our excerpts of record, pages 893, 898, and 905, those are all financial statements of the tribal EPA. So to the extent that your honors were looking at, well, is this agency part of the tribe or is it separate from the tribe, I still concede it's part of the tribal government. It's an agency the way that an agency in the state of California is a part of the state government. But it is separate. It's the only entity that got money. The fact that we refer to the tribe several times throughout the plea agreement, if you look at those references, not one time was there a concession that the tribe government got the money or that the tribe got the money or that it even mattered, because we've always argued that the transactions were those of Enterprises Corporation. And it's worth looking back again at the way the tribe and enterprises treat themselves. The charter for the Enterprises Corporation says our transactions are not those of the tribe. They very much want to keep those separate. And all of the resolutions that adopted the plan to get a loan from a bank or to hire Cadmus, all of those were adopted by Enterprises Corporation. A 17C corporation is not an arm in any sense the way, say, if you had tribal law and you created a corporation, that might be considered an arm of the tribe. It is a separate corporation. And all the 17C rules under the statute say that these are created to form separate corporations so tribes can engage in commercial business. And yes, a 17C corporation is by nature, it has sovereign immunity, but it can waive that sovereign immunity. Otherwise, a bank would never lend them money. Otherwise, they would never be able to sue to get the money back. So when Enterprises Corporation borrowed $120 million to engage in these financial transactions to build up the casino, it waives its sovereign immunity and the tribe retains its own and the tribe is insulated. That's why we have corporations. And then the last two points I wanted to make relate to Mr. Freedman's arguments. The tribe has no right to appeal. I don't think that you should convert this now into a writ of mandamus. If the tribe had wanted a fight about what components ought to have been in the restitution order, it could have done that. It could have filed a petition for a writ of mandamus. We would have come to this court and then Judge Fitzgerald might have had more guidance about how to handle it. They don't have a right to appeal and the government concedes that. But that's a legal question. Standing is a legal question pertaining to jurisdiction, so it doesn't matter whether the government agrees with you or doesn't. That's right. And the right to appeal is a statutory right. I wasn't sure what relevance the government's position has on that question. The government isn't saying that I read the law wrong. It could say either one. I just don't understand why that matters to us. What I think matters is that the right to appeal is created by statute by Congress. Congress created a whole mechanism. I understand your position. I just was inquiring why you had emphasized that. And then finally, well, two other points. Mr. Freeman says that the EPA, in his argument, has to oversee all the construction of the tribe. There's absolutely nothing about that in the record. The government never presented any evidence, not even in the discovery was there anything else, anything about the tribal EPA. And I was trying to find, at page 840 of our record, is a picture of the tribal EPA website about what it does. And, counsel, you're way over your time, so if you'd like to maybe wrap up with a final point. Oh, I apologize. And the last point was that the judge gave the tribe an opportunity to submit information about the legal fees and various other expenses, and he found those submissions to be useless. And I don't think that we now have to go back and redo that. We should not have to do that. Thank you, counsel. The case just argued is submitted, and we appreciate the arguments of all counsel. They've been quite helpful to us. And with that, we are adjourned. All rise. This court for this session stands adjourned.
judges: Graber, Bybee, Christen